GIBSON, DUNN & CRUTCHER LLP
Theodore J. Boutrous, Jr., SBN 132009
TBOUTROUS@GIBSONDUNN.COM
333 S. Grand Avenue
Los Angeles, CA 90071
T: (213) 229-7804 | F: (213) 229-7520

Ethan D. Dettmer, SBN 196046
EDETTMER@GIBSONDUNN.COM
Enrique A. Monagas, SBN 239087
EMONAGAS@GIBSONDUNN.COM
555 Mission Street, Suite 3000
San Francisco, CA 94105
T: (415) 393-8292 | F: (415) 374-8444

Attorneys for Chevron Corporation,
Dr. Michael A. Kelsh, and Exponent, Inc.

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| *In re* Application of:<br><br>REPUBLIC OF ECUADOR and DR. DIEGO GARCIA CARRION, the Attorney General of the Republic of Ecuador,<br><br>Applicants,<br><br>For the Issuance of a Subpoena Under 28 U.S.C. § 1782 to Dr. MICHAEL A. KELSH for the Taking of a Deposition and the Production of Documents in a Foreign Proceeding,<br><br>and<br><br>*In re* Application of:<br><br>REPUBLIC OF ECUADOR and DR. DIEGO GARCIA CARRION, the Attorney General of the Republic of Ecuador,<br><br>Applicants,<br><br>For the Issuance of a Subpoena Under 28 U.S.C. § 1782(a) to EXPONENT, INC., D/B/A DELAWARE EXPONENT, INC., for the Production of Documents in a Foreign Proceeding. | CASE NO. 11-mc-80171-CRB<br>         11-mc-80172-CRB<br><br>**CHEVRON CORPORATION, DR. MICHAEL A. KELSH, AND EXPONENT, INC.'S  JOINT MEMORANDUM IN OPPOSITION TO THE REPUBLIC OF ECUADOR AND DR. DIEGO GARCÍA CARRIÓN'S APPLICATIONS FOR AN ORDER UNDER 28 U.S.C. § 1782 TO ISSUE SUBPOENAS TO DR. MICHAEL A. KELSH AND EXPONENT, INC.** |

**<u>TABLE OF CONTENTS</u>**

**<u>Page</u>**

I.      INTRODUCTION ............................................................................................................ 1

II.     FACTUAL BACKGROUND......................................................................................... 4

     A.      The Lago Agrio Litigation. ....................................................................... 5

     B.      The Treaty Arbitration. ............................................................................. 7

     C.      The ROE's Applications for Discovery from Dr. Kelsh and
           Exponent. ................................................................................................... 9

III.    ARGUMENT.................................................................................................................. 10

     A.      Section 1782 Discovery Is Improper Because The Discovery
           Sought Is Available to The Tribunal in The Treaty Arbitration. ............... 10

     B.      Section 1782 Discovery Is Improper Because the ROE's
           Applications Conceal An Effort to Circumvent Treaty Arbitration
           Procedures. ................................................................................................ 13

     C.      Section 1782 Discovery Is Improper Because the ROE's
           Applications Are Overbroad and Unduly Burdensome. ........................... 14

     D.      Section 1782 Discovery Is Improper Because the ROE's Section
           1782 Applications Are Being Advanced for An Improper Purpose. ......... 17

     E.      If This Court Decides to Grant the ROE Discovery Under Section
           1782, Chevron Reserves the Right to Apply for Reciprocal
           Discovery. ................................................................................................. 18

IV.     CONCLUSION .............................................................................................................. 19

Gibson, Dunn &
Crutcher LLP

JOINT MEMORANDUM IN OPPOSITION THE ROE'S 28 U.S.C. § 1782 APPLICATIONS
CASE NOS. 11-mc-80171-CRB, 11-mc-80172-CRB

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Advanced Micro Devices v. Intel Corp.*,
    No. 01-mc-7033-JW, 2004 WL 2282320 (N.D. Cal. Oct. 4, 2004)......................................... 11

*Alper v. United States*,
    190 F.R.D. 281 (D. Mass. 2000) ........................................................................................ 12

*Aventis Pharma v. Wyeth*,
    No. M-19-70, 2009 WL 3754191 (S.D.N.Y. Nov. 9, 2009) ................................................ 11

*Chevron Corp. v. Champ*,
    No. 10-mc-00027 (W.D.N.C. Aug. 30, 2010)............................................................ 6, 9, 13

*Chevron Corp. v. Donziger*,
    768 F. Supp. 2d 581 (S.D.N.Y. 2011) ("*Injunction Opinion*") ...................................... *passim*

*Four Pillars Enters. Co. v. Avery Dennison Corp.*,
    308 F.3d 1075 (9th Cir. 2002)............................................................................................ 17

*In re Applic. of Caratube Int'l Oil Co.*,
    730 F. Supp. 2d 101 (D.D.C. 2010) ................................................................................... 13

*In re Applic. of Chevron Corp.*,
    No. 10-mc-00021-JCH-LFG (D.N.M. Sept. 2, 2010)............................................................ 6

*In re Applic. of Chevron Corp.*,
    No. 10-mc-00134 (S.D. Tex. May 20, 2010) ..................................................................... 13

*In re Applic. of Chevron Corp.*,
    No. 10-mi-00076-TWT (N.D. Ga. Mar. 2, 2010) ............................................................... 12

*In re Applic. of Digitechnic*,
    No. 2:07-cv-414-JCC, 2007 WL 1367697 (W.D. Wash. May 8, 2007) ............................... 14

*In re Applic. of the Republic of Ecuador*,
    No. 10-mc-80225-CRB (N.D. Cal. Jan. 26, 2011)......................................................... 2, 11

*In re Applic. of the Republic of Ecuador*, No. 11-mc-00073-RH-WCS (N.D. Fla.
    July 20, 2011)...................................................................................................................... 3

*In re Babcock Borsig AG*,
    583 F. Supp. 2d 233 (D. Mass. 2008) ............................................................................... 17

*In re Chevron Corp.*,
    749 F. Supp. 2d 170 (S.D.N.Y. Nov. 30, 2010), *aff'd sub nom.*.......................................... 3, 6

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*In re Labor Court of Brazil*,
   466 F. Supp. 2d 1020 (N.D. Ill. 2006) ................................................................. 18

*In re Marano*,
   No. 4:09-mc-80020-DLJ, 2009 WL 482649 (N.D. Cal. Feb. 25, 2009) .......................... 15, 16

*In re Microsoft Corp.*,
   428 F. Supp. 2d 188 (S.D.N.Y. 2006) ........................................................ 1, 11, 13, 14

*In re Request for Judicial Assistance*,
   748 F. Supp. 2d 522 (E.D. Va. 2010) ................................................................. 11

*Intel v. Advanced Micro Devices, Inc.*,
   542 U.S. 241 (2004) ..................................................................... 1, 2, 14, 16

*Kulzer v. Biomet Inc.*,
   No. 3:09-mc-275-CAN, 2009 WL 3642746 (N.D. Ind. Oct. 29, 2009) ........................... 2, 14

*Lago Agrio Plaintiffs v. Chevron Corp.*,
   409 Fed. Appx. 393 (2d Cir. 2010) ................................................................. 3, 6

*Lazaridis v. Int'l Centre for Missing & Exploited Children*,
   760 F. Supp. 2d 109 (D.D.C. 2011) ................................................................. 14

*Republic of Ecuador v. ChevronTexaco Corp.*,
   376 F. Supp. 2d 334 (S.D.N.Y. 2005) ................................................................. 4, 5

*Schmitz v. Bernstein Liebhard & Lifshitz, LLP*,
   376 F.3d 79 (2d Cir. 2004) ................................................................. 11

*United Kingdom v. United States*,
   238 F.3d 1312 (11th Cir. 2001) ................................................................. 18

## STATUTES

28 U.S.C. § 1782(a) ................................................................. 16

## OTHER AUTHORITIES

Final Report of FLACSO-Petroecuador Project (Nov. 2003) ................................. 5

International Bar Association Rules on the Taking of Evidence in International
   Arbitration, Art. 3.10 (2010) ................................................................. 12

International Bar Association Rules on the Taking of Evidence in International
   Arbitration, Art. 3.13 (2010) ................................................................. 18

International Bar Association Rules on the Taking of Evidence in International
   Arbitration, Art. 3.2 (2010) ................................................................. 14

Gibson, Dunn &
Crutcher LLP

iii

International Bar Association Rules on the Taking of Evidence in International
   Arbitration, Art. 3.3 (2010) ............................................................................... 14

International Bar Association Rules on the Taking of Evidence in International
   Arbitration, Art. 3.9 (2010) ............................................................................... 14

UNCITRAL Arbitration Rules, Art. 24.3 (1976) ......................................................... 12

# RULES

Fed. R. Civ. P. 26(b)(3)(A) ............................................................................................ 15

Fed. R. Civ. P. 26(b)(4)(B) ............................................................................................ 15

Fed. R. Civ. P. 26(b)(4)(C) ............................................................................................ 15

Gibson, Dunn &
Crutcher LLP

Chevron Corporation, Dr. Michael Kelsh, and Exponent, Inc. (collectively, "Respondents"), respectfully submit this memorandum in opposition to the Republic of Ecuador and Dr. Diego García Carrión's (collectively, the "ROE") (1) Application for an Order Under 28 U.S.C. § 1782 to Issue a Subpoena to Dr. Michael A. Kelsh for the Taking of a Deposition and the Production of Documents for Use in a Foreign Proceeding; and (2) Application for an Order Under 28 U.S.C. § 1782 to Issue a Subpoena to Exponent, Inc. for the Production of Documents for Use in a Foreign Proceeding (collectively, the "Applications").[1]

## I.    INTRODUCTION

This Court should not use the authority granted it by 28 U.S.C. § 1782 to preempt an international arbitration tribunal's decision-making or undermine that tribunal's proof-gathering procedures. Yet the ROE's Applications seek exactly that, and would divest an arbitration tribunal of its jurisdiction to adjudicate matters before it, improperly replacing tribunal discovery decisions with a decision from this Court. The ROE's Applications contravene the express purpose of § 1782 and should be denied.

First, where the discovery sought is available through the foreign tribunal, the Supreme Court has directed district courts to deny § 1782 applications, observing that "[a] foreign tribunal has jurisdiction over those appearing before it, and can itself order them to produce evidence." *Intel v. Advanced Micro Devices, Inc.*, 542 U.S. 241, 264 (2004). Here, the ROE, the respondent in an international arbitration (the "Treaty Arbitration"), seeks discovery from Chevron, a claimant in the Treaty Arbitration, through a Chevron-affiliated expert, Dr. Kelsh, and his former employer, Exponent. Under these circumstances, discovery under § 1782 is unnecessary and improper: "The relevant inquiry is whether the evidence is available to the foreign tribunal. In this case, it is. Thus, § 1782 aid is both unnecessary and improper." *In re Microsoft Corp.*, 428 F. Supp. 2d 188, 194 (S.D.N.Y. 2006).

---

[1]    In the § 1782 application directed at Exponent (11-mc-80712-CRB), the ROE only seeks discovery "to the extent that Exponent maintains documents related to Dr. Kelsh's work for Chevron in the Lago Agrio action and the Treaty Arbitration." Exponent Mem. at 3.

Gibson, Dunn &
Crutcher LLP

1      Indeed, in direct contrast to its position here, the ROE previously argued before this Court

2 that, as a party to the Treaty Arbitration, it should not be subject to § 1782 discovery from Chevron:

3 "as the Supreme Court underscored in *Intel v. AMD*, participants in a foreign proceeding are subject

4 to that foreign tribunal's jurisdiction to order discovery, and, as a consequence, there is no need for

5 U.S. court-ordered discovery of a party to that foreign dispute." Ex. 1 at 1-2 (The ROE's Suppl. Opp.

6 to Borja's Mot. for Reconsideration, *In re Applic. of the Republic of Ecuador*, No. 10-mc-80225-CRB

7 (N.D. Cal. Jan. 26, 2011)).[2]   The ROE contended that only the arbitral tribunal—not a United States

8 court—can order fair, reciprocal discovery from the parties to the Treaty Arbitration:   "it is the

9 arbitral tribunal, not a court of the United States, that should decide whether the Republic or Chevron

10 should engage in discovery . . . ." Ex. 2 at 6 (Reply in Supp. of Mot. to Compel, *In re Applic. of the

11 *Republic of Ecuador*, No. 10-mc-80225-CRB (N.D. Cal. Jan. 24, 2011)).   Having successfully

12 resisted discovery under § 1782 by invoking the jurisdiction of the Treaty Arbitration tribunal

13 ("Tribunal"), the ROE cannot reverse course and pursue § 1782 discovery of its own against

14 Chevron.

15      Second, where the discovery sought would circumvent the foreign tribunal's proof-gathering

16 restrictions, § 1782 discovery should not be granted.   *Intel*, 542 U.S. at 264-65.   The ROE has not

17 sought this discovery through the Tribunal, as is permitted under the relevant arbitral rules and which

18 would ensure fair, reciprocal discovery.   Rather, the ROE has disdained the Tribunal's procedures

19 and sought discovery from this Court under § 1782 as if it were the discovery court of first instance.

20 This effort is patently improper.   *Kulzer v. Biomet Inc*., No. 3:09-mc-275-CAN, 2009 WL 3642746,

21 at *6 (N.D. Ind. Oct. 29, 2009) (Section 1782 is not intended "to allow unfettered access to the

22 United States' courts or to encourage foreign parties to 'forum shop,' whenever the procedures of

23 their home tribunal are less favorable to their case.").

24      Third, the ROE's Applications should be rejected as "unduly intrusive or burdensome," *Intel*,

25 542 U.S. at 265, both because of their substantial overbreadth and because they seek documents that

26 are privileged under United States law.   Under the false pretext that it will need to "relitigate the

27

28     [2]     "Ex." refers to exhibits to the concurrently-filed Declaration of Ethan D. Dettmer.

Gibson, Dunn &
Crutcher LLP

JOINT MEMORANDUM IN OPPOSITION THE ROE'S 28 U.S.C. § 1782 APPLICATIONS
CASE NOS. 11-mc-80171-CRB, 11-mc-80172-CRB

1    underlying merits" of environmental claims brought against Chevron in Ecuador, the ROE seeks

2    discovery from Dr. Kelsh and Exponent that is outside the scope of the Treaty Arbitration, and well

3    beyond any discovery permitted of an expert witness under Federal Rule of Civil Procedure 26.

4        Finally, the ROE's Applications should be rejected because they have been brought for an

5    improper purpose.  The ROE has been colluding for years with a group of plaintiffs' (the "Lago

6    Agrio Plaintiffs" or "LAPs") lawyers suing Chevron in Lago Agrio, Ecuador.  *In re Chevron Corp.*,

7    749 F. Supp. 2d 170, 184 (S.D.N.Y. Nov. 30, 2010), *aff'd sub nom.*, *Lago Agrio Plaintiffs v. Chevron

8    Corp.*, 409 Fed. Appx. 393, 395-96 (2d Cir. 2010) ("[The ROE] has been working closely with

9    [counsel for the LAPs] for years and stands to gain billions for Ecuador if the [LAPs] prevail against

10   Chevron."); *In re Chevron Corp.*, 749 F. Supp. 2d 141, 162 (S.D.N.Y. Nov. 10, 2010) ("There is

11   substantial evidence that [counsel for the LAPs] have improperly colluded with [the ROE]."). After

12   uncovering overwhelming evidence of fraud and corruption in the Lago Agrio lawsuit, Chevron filed

13   civil RICO and other claims in the Southern District of New York against the LAPs and their

14   attorneys and representatives.  Ex. 3.  A trial on portions of that SDNY action is set to begin on

15   November 14, 2011; discovery closes on September 15, 2011; and Dr. Kelsh is one of Chevron's

16   expert witnesses in the matter.[3]  While the ROE has failed to identify, either in the Applications or in

17   its Motions to Expedite (Dkt. 13), any pending deadline or imminent action by the Tribunal that

18   would require expedited discovery of Dr. Kelsh and Exponent, the SDNY case deadlines are

19   imminent.  The ROE's Applications are intended to improperly aid the LAPs and interfere with

20   Chevron's discovery and trial preparation in the SDNY litigation.

21       Because the ROE's Applications were filed for an improper purpose, would circumvent the

22   Tribunal, and are facially overbroad and intrusive, this Court should reject the request for Treaty

23   Arbitration discovery.  If this Court nonetheless decides to grant such discovery, which it should not,

24   Chevron reserves the right to request a reciprocal exchange of information to ensure parity between

26   3    A day before filing the present Applications, the ROE filed a § 1782 application seeking
27        expedited discovery from Dr. Robert E. Hinchee, another of Chevron's expert witnesses in the
          SDNY case.  *In re Applic. of the Republic of Ecuador*, No. 11-mc-00073-RH-WCS (N.D. Fla.
28        July 20, 2011).

Gibson, Dunn &
Crutcher LLP

3

1    the Treaty Arbitration parties. And given the improper purpose for which this discovery is sought,

2    Chevron requests that any discovery be strictly limited to the two reports authored by Dr. Kelsh that

3    were submitted to the Tribunal in the Treaty Arbitration and to matters permitted by Federal Rule of

4    Civil Procedure 26, and that any discovery be subject to a protective order strictly limiting its

5    distribution and use.

6    **II.    FACTUAL BACKGROUND**

7           The ROE's request for discovery under § 1782 relates to an $18 billion fraud perpetrated by

8    lawyers and consultants in the United States and Ecuador against Chevron, with the active

9    participation of Ecuadorian judges and other government officials. The "facts" asserted in the ROE's

10   Applications minimize and distort the Ecuadorian government's role in oil production on land it

11   owns, and its role in the ongoing fraud in its courts, issues that are central to the Treaty Arbitration

12   upon which the Applications are based.

13          From 1964 to 1992, Texaco Petroleum Company ("TexPet") held an interest in an oil

14   consortium in the Oriente region of Ecuador. By 1976, the ROE's state-owned oil company,

15   Petroecuador, had become the majority owner of that consortium, and it has been the sole owner and

16   operator since 1992. *Chevron Corp. v. Donziger*, 768 F. Supp. 2d 581, 597 (S.D.N.Y. 2011)

17   ("*Injunction Opinion*"), attached as Ex. 4.[4] In 1995, TexPet, the ROE, and Petroecuador entered into

18   a settlement under which TexPet agreed to remediate a portion of the former consortium sites

19   proportionate to its minority ownership interest, and Petroecuador took responsibility for remediating

20   all remaining sites. *Republic of Ecuador v. ChevronTexaco Corp*., 376 F. Supp. 2d 334, 341-42

21   (S.D.N.Y. 2005). In 1998, after TexPet completed its remediation, which was conducted under the

22   supervision of the ROE and independent auditors, Petroecuador and the ROE "releas[ed], absolv[ed],

23

24

25

26

----

27   [4]   Before its termination, the consortium's activities generated US$23 billion in profits, more

28       than 97% of which was retained by the ROE. Ex. 5 at ¶ 4.

Gibson, Dunn &
Crutcher LLP

1    and discharg[ed]" TexPet from any environmental liability arising from the consortium's activities.

2    *Id*. at 342.[5]

3       Petroecuador, on the other hand, failed for years to conduct any remediation of the former

4    consortium sites, and has compiled an abysmal environmental record during nearly two decades of

5    subsequent operations, including 1,415 spill events between 2000 and 2008 alone. Ex. 6. This record

6    led Ecuador's President Correa to publicly declare that Petroecuador has "dreadful environmental

7    management practices," Ex. 7 (Press Conf. by President Rafael Correa (Apr. 27, 2007)), and the

8    LAPs' counsel to admit that "Petro[ecuador] has inflicted more damage and many more disasters

9    than Texaco itself . . . [b]ut since it's a state-owned company, since it's the same people involved in

10   the laws and all, no one says a thing," Ex. 8 (Final Report of FLACSO-Petroecuador Project at 77

11   (Nov. 2003) (citing the LAPs' counsel Pablo Fajardo)).

12      **A.**      **The Lago Agrio Litigation.**

13       In 2003, a group of American and Ecuadorian lawyers filed suit against Chevron—but not

14   against Petroecuador or the ROE—in Lago Agrio, Ecuador, claiming that TexPet's operation of the

15   oil consortium harmed the environment. *Injunction Opinion*, 768 F. Supp. 2d at 600. To support this

16   case, the ROE committed itself to trying to find a way to circumvent the 1995 settlement. In an

17   August 10, 2005 email to counsel for the LAPs, an Ecuadorian Deputy Attorney General stated that,

18   "all of us working on the State's defense were searching for a way to nullify or undermine the value

19   of the remediation contract and the final acta [the 1998 release agreement]." Ex. 9. The same email

20   explained that, to undermine the release, the Attorney General was determined to prosecute "those

21   who executed" the settlement and release agreements, despite prior investigations demonstrating the

22   absence of any wrongdoing: "The Attorney General remains resolved to have the Comptroller's

23   Office conduct another audit . . . ; he wants to criminally try those who executed the [release]." *Id*.

24

25

26    [5]   At the time it released TexPet from all environmental claims in 1998, the Ecuadorian government was the only entity empowered to vindicate or settle claims for generalized environmental damages. Ex. 3 at ¶ 63. Individuals in Ecuador were limited to suits for personal injury or property damage, thus, the 1995 settlement "applied without prejudice to the rights possibly held by third parties." Dkt. 1-1 at 9.

27

28

Gibson, Dunn &
Crutcher LLP

5

The LAPs' attorneys themselves acknowledged their collusion with the ROE, and the importance of keeping that collusion secret: "Dude, if [Chevron's attorneys] get a hold of this, it's gonna hurt us. It's pretty much irrefutable evidence of us collaborating with the fiscalia [Prosecutor General of Ecuador] to get [TexPet's attorneys] convicted." Ex. 10 at 2.

The ROE's improper involvement in the Lago Agrio litigation has not escaped the notice of United States courts. The Southern District of New York has found that "[t]here is substantial evidence that [counsel for the LAPs] have improperly colluded with [the ROE]." *In re Chevron Corp.*, 749 F. Supp. 2d 141, 162 (S.D.N.Y. Nov. 10, 2010). That court also found that the ROE and the LAPs have formed an "alliance . . . , which has both financial and political interests in the success of the lawsuit," and that "[the ROE] has been working closely with [counsel for the LAPs] for years and stands to gain billions for Ecuador if the Lago Agrio plaintiffs prevail against Chevron." *In re Chevron Corp.*, 749 F. Supp. 2d 170, 172, 184 (S.D.N.Y. Nov. 30, 2010), *aff'd sub nom.*, *Lago Agrio Plaintiffs v. Chevron Corp.*, 409 Fed. Appx. 393, 395-96 (2d Cir. 2010).

The ROE's collusion with the LAPs is only one part of a far broader fraudulent scheme involving the Lago Agrio litigation. The United States District Court for the District of New Mexico concluded that the LAPs and their attorneys and representatives engaged in "corruption of the judicial process, fraud, attorney collusion with the Special Master, inappropriate ex parte communications with the court, and fabrication of reports and evidence." Ex. 11 at 3 (*In re Applic. of Chevron Corp.*, No. 10-mc-00021-JCH-LFG (D.N.M. Sept. 2, 2010)). The Southern District of New York found: "There is substantial evidence that [counsel for the LAPs] have improperly . . . pressured, intimidated, and influenced Ecuadorian courts . . . ." *In re Chevron Corp.*, 749 F. Supp. 2d 141, 162 (S.D.N.Y. Nov. 10, 2010) (corrected opinion). And the Western District of North Carolina concluded that "what has blatantly occurred in this matter would in fact be considered fraud by any court." Ex. 12 at 12 (*Chevron Corp. v. Champ*, No. 10-mc-00027 (W.D.N.C. Aug. 30, 2010)). Indeed, the Lago Agrio proceedings and the $18 billion judgment issued by the Ecuadorian court on February 14, 2011, are so deeply marred by fraud and corruption that the Southern District of New York issued a preliminary injunction prohibiting the LAPs, their agents, and co-conspirators from seeking to enforce the Lago Agrio judgment. *Injunction Opinion*, 768 F. Supp. 2d at 660. The District Court's

*Injunction Opinion* details much of the fraud and corruption that infected the Lago Agrio proceeding, refuting many of the "facts" the ROE represents here, and is submitted herewith. *See Injunction Opinion*, 768 F. Supp. 2d at 595-625.

### B. The Treaty Arbitration.

In September 2009, Chevron and TexPet commenced the Treaty Arbitration against the ROE. Ex. 13 (Notice of Arbitration (Sept. 23, 2009)). The Treaty Arbitration is based on the Bilateral Investment Treaty entered into between the United States and the ROE (the "BIT" or the "Treaty"), which establishes procedures for American investors to bring claims before an impartial tribunal when their rights under the Treaty have been violated. The investor may submit "the dispute for settlement by binding arbitration . . . in accordance with the Arbitration Rules of the United Nations Commission on International Trade Law (UNCITRAL)," among other options. Ex. 14 (U.S.-Ecuador Bilateral Investment Treaty (Aug. 27, 1993)).

Chevron and TexPet invoked this BIT arbitration procedure to seek relief from the ROE's denials of due process, fair treatment, and international-law rights in the Lago Agrio litigation. Chevron and TexPet alleged in their notice of arbitration that "[i]n breach of the 1995 and 1998 agreements and the Treaty, Ecuador today is colluding with a group of Ecuadorian plaintiffs and U.S. contingency-fee lawyers" in the Lago Agrio litigation and that "Ecuador improperly seeks to shift to Chevron the responsibility for impact[s] caused by Petroecuador's own oil operations since 1992." Ex. 13 at ¶ 3. The ROE's unlawful actions "involve[] Ecuador's various organs of State," and "Ecuador's judicial branch has conducted the Lago Agrio litigation in total disregard of Ecuadorian law, international standards of fairness, and Chevron's basic due process and natural justice rights, and in apparent coordination with the executive branch and the Lago Agrio plaintiffs." *Id.* ¶ 4. Contrary to assertions by the ROE in its Applications, Chevron does not seek to retry the merits of the Lago Agrio litigation in the Treaty Arbitration (Kelsh App. at 3), but rather seeks to address the ROE's conduct in violation of Chevron's Treaty rights, including its due process rights and Chevron's and TexPet's rights under the settlement and release agreements.

Chevron filed a request for interim relief before the Tribunal in April of 2010, and after hearings and the presentation of extensive evidence supporting Chevron's claims for interim relief,

Gibson, Dunn & Crutcher LLP

7

including evidence regarding litigation fraud and collusion with the ROE, the Tribunal issued an interim order requiring the ROE "to take all measures at its disposal to suspend or cause to be suspended the enforcement or recognition within and without Ecuador of any judgment against Chevron in the Lago Agrio case" pending further order of the Tribunal.  *See* Ex. 15 (Order for Interim Measures, Treaty Arbitration between Chevron and the ROE, The Hague, Permanent Court of Arbitration, Case No. 2009-23 (Feb. 9, 2011)).[6]

While Chevron's request for interim measures was pending, it submitted to the Tribunal a "Memorial on the Merits" ("Memorial"), in which Chevron described in detail the basis for and evidence supporting its arbitration claim.  That Memorial, on which the ROE bases its § 1782 Applications, was submitted on September 6, 2010—almost a year ago.  Since Chevron's Memorial was submitted, the ROE has not made any attempt to seek discovery of any kind through the Tribunal.

In fact, since November of 2010, the Tribunal has been considering the ROE's arguments about whether it has jurisdiction to hear the Treaty Arbitration, and the ROE has repeatedly resisted any attempt to proceed to the merits of Chevron's Treaty Arbitration claims.[7]  The ROE has argued to the Tribunal that document exchanges or discovery requests should not yet begin in the Treaty Arbitration, and that it would be a waste of "its precious public resources" to entertain the merits of Chevron's claims while the Tribunal was still considering arguments about jurisdiction.  The ROE asserted that it would "not incur the expense of instructing its lawyers to proceed to the merits of this

---

[6]   Each of the letters cited by the ROE for the proposition that Chevron has "repeatedly sought aggressive schedules in the international arbitration" (Dkt 13. at 4), predate the Tribunal's Order for Interim Measures, and were submitted while the threat was imminent that the Ecuadorian court would issue a judgment in the Lago Agrio litigation that the LAPs would then use to try to disrupt Chevron operations worldwide.  Indeed, while the ROE predicates much of its argument about urgency on the fact that Chevron asked the Tribunal to give the ROE 60 days to respond to Chevron's merits submission, Chevron made that request almost eight months ago.  The ROE has successfully opposed setting any schedule for filing its response to Chevron's merits submission.

[7]   There are no existing deadlines in the Treaty Arbitration.  Once the Tribunal has considered jurisdictional arguments, it will set a schedule for further proceedings, including consideration of the merits.

Gibson, Dunn &
Crutcher LLP

1   case unless and until it is obliged to do so," and "that obligation w[ould] arise only upon receipt of an

2   award from the Tribunal to the effect that it has upheld jurisdiction." Ex. 16 at 5 (The ROE's Letter

3   to the Tribunal (Jan. 21, 2011)).  In other words, the ROE repeatedly has objected in the Treaty

4   Arbitration to any discovery or document exchange, while it is urging this Court to order Treaty

5   Arbitration discovery from Dr. Kelsh and Exponent on an expedited basis.[8]

6           **C.      The ROE's Applications for Discovery from Dr. Kelsh and Exponent.**

7           The ROE filed the instant § 1782 Applications on July 21, 2011, indicating that discovery

8   from Dr. Kelsh is relevant because "Chevron has now submitted several of Dr. Kelsh's expert

9   reports" from the Lago Agrio litigation in support of its Merits submission in the Treaty Arbitration

10  to contest the award of $1.4 billion for new health care infrastructure and $800 million for cancer

11  treatment.  Kelsh App. at 4.  The ROE seeks extensive discovery regarding all documents relating to

12  any work by Dr. Kelsh regarding Chevron's potential liabilities in Ecuador, and copies of all other

13  reports and testimony Dr. Kelsh has given as an expert witness in the past ten years.  In the § 1782

14  application directed at Exponent, the ROE only seeks discovery "to the extent that Exponent

15  maintains documents related to Dr. Kelsh's work for Chevron in the Lago Agrio action and the

16  Treaty Arbitration." Exponent Mem. at 3.

17          Dr. Kelsh is an epidemiologist who served as an expert nominated by Chevron in the Lago

18  Agrio litigation.  *See* Kelsh Mem. at 1-2.  In 2008, he submitted a detailed report (Bloom Decl.,

19  Ex. 49) to rebut claims made in the global damages assessment of the supposedly neutral court expert

20  Richard Stalin Cabrera Vega ("Cabrera Report"), a report that Chevron has since discovered to have

21  been ghostwritten by the LAPs.  *See Injunction Opinion*, 768 F. Supp. 2d at 606-11); Ex. 12 at 12

22  (*Chevron Corp. v. Champ*, No. 10-mc-00027 (W.D.N.C. Aug. 30, 2010)).  In this rebuttal, Dr. Kelsh

23  concluded that the Cabrera Report's initial assessment of $2.9 billion in damages for excess cancer

24

25
26          [8]     On July 29, 2011, Chevron submitted a letter to the Tribunal noting that, by filing these
                § 1782 applications, the ROE has indicated willingness to begin the merits phase of the Treaty
27              Arbitration, and asking the Tribunal to set a schedule for discovery.  Ex. 17.  The Tribunal
                acknowledged receipt of Chevron's letter and stated that Chevron's request "will be addressed
28              by the Tribunal in due course."  Ex. 18.

Gibson, Dunn &
Crutcher LLP

9

deaths attributable to the former Consortium and $480 million in costs for a new, public health infrastructure plan was "based on false assumptions and erroneous calculations regarding health risks, disease rates, and potential environmental exposures" because "[n]o adverse health risks have been demonstrated." Bloom Decl., Ex. 49 at 4, 7.  In 2009, Dr. Kelsh submitted another report in the Lago Agrio litigation to respond to a supplemental report supposedly authored by Cabrera (the "Cabrera Supplemental Report"), which increased the amount of excess cancer deaths and the amount of damages from $2.9 billion to over $9.5 billion.  In this 2009 report, Dr. Kelsh concluded that the Cabrera Supplemental Report "does not present any valid scientific evidence . . . to support [its] claim of increased numbers of cancer deaths in the region." Bloom Decl., Ex. 50 at 2.  Dr. Kelsh submitted additional reports in 2010, including responding to the LAPs' experts' opinions regarding excess cancer deaths and public health infrastructure. See Bloom Decl., Ex. 51.

Chevron has not designated Dr. Kelsh as an expert witness who will testify in the Treaty Arbitration.  Rather, Chevron's reliance on Dr. Kelsh's reports is limited to a footnote regarding the invalidity of Mr. Cabrera's assessment, where two of Dr. Kelsh's reports are cited along with sixteen other expert reports.  Ex. 19 at ¶ 240 n.584.  In accordance with standard practice in arbitral proceedings, Chevron submitted most of its reference materials as exhibits to the Memorial.  Two of Dr. Kelsh's reports were therefore included among the 306 exhibits attached to the Memorial.[9]  The ROE does not assert any impropriety or fraud on the part of Dr. Kelsh, nor has it questioned his reports' conclusions.

## III.    ARGUMENT

### A.    Section 1782 Discovery Is Improper Because The Discovery Sought Is Available to The Tribunal in The Treaty Arbitration.

The Supreme Court in Intel set out discretionary factors for courts to consider in determining whether to order discovery pursuant to § 1782.  The first is "[w]hether the documents or testimony

---

[9]    Chevron submitted a total of 976 exhibits to the Tribunal, including U.S. State Department reports, Ex. 19 at ¶ 511, n.1299, letters from the Ecuadorian Ambassador to the United States, id. at ¶ 70, n.158, expert reports by Ecuadorian government investigators, id. at ¶ 319, n.840-43, and many other types of documents.

sought are within the foreign tribunal's jurisdictional reach, and thus accessible absent § 1782 aid." *In re Microsoft*, 428 F. Supp. 2d at 192-93; *Aventis Pharma v. Wyeth*, No. M-19-70, 2009 WL 3754191, at *2 (S.D.N.Y. Nov. 9, 2009) (denying § 1782 application because "[t]his Court sees no reason why it should support [applicant] in seeking to compel [respondent]" to produce documents available to it through the foreign tribunal). Where the discovery sought is within the foreign tribunal's jurisdictional reach, as it is here, § 1782 discovery "is both unnecessary and improper." *Id.* at 194.[10] The ROE itself recently invoked precisely this argument in *this Court* in opposing a request for § 1782 discovery, Ex. 2 at 6 (Reply in Supp. of Mot. to Compel, *In re Applic. of the Republic of Ecuador*, No. 10-mc-80225-CRB (N.D. Cal. Jan. 24, 2011)), and this Court adopted it—rejecting § 1782 discovery because "it is not clear that the material sought [by Chevron] is not already within the jurisdictional reach of the foreign tribunal." Ex. 20 at 15 (Order, *In re Applic. of the Republic of Ecuador*, No. 10-mc-80225-CRB (N.D. Cal. Feb. 22, 2011)).

The question relevant to this *Intel* factor is not whether the Tribunal has *in personam* jurisdiction over Dr. Kelsh, but rather, whether the discovery being sought is available to the foreign tribunal without the assistance of this Court. *In re Request for Judicial Assistance*, 748 F. Supp. 2d 522, 526 (E.D. Va. 2010) ("[A]lthough this factor was originally expressed as a 'participant' versus 'nonparticipant' analysis under the facts presented in *Intel*, the true question at hand is whether the requested discovery is available to the foreign tribunal without the assistance of this Court."); *In re Microsoft*, 428 F. Supp. 2d at 194 (rejecting § 1782 application because "[w]hile IBM and Cleary

---

[10] *See also Schmitz v. Bernstein Liebhard & Lifshitz, LLP*, 376 F.3d 79, 85 (2d Cir. 2004) (affirming denial of discovery because the respondent is "subject to German court jurisdiction" and therefore "petitioner's need for § 1782 help 'is not as apparent as it ordinarily is'"); *Advanced Micro Devices v. Intel Corp.*, No. 01-mc-7033-JW, 2004 WL 2282320, at *2 (N.D. Cal. Oct. 4, 2004) (denying discovery after remand because, "the EC has jurisdiction over Intel, and therefore could simply ask Intel to produce any or all of the discovery AMD now seeks"); *In re Applic. of Digitechnic*, No. 2:07-cv-414-JCC, 2007 WL 1367697, at *4 (W.D. Wash. May 8, 2007) ("The first *Intel* factor suggests that . . . French discovery devices can adequately provide what Digitechnic seeks. . . . . [T]he Court is unconvinced that Digitechnic cannot obtain any of the discovery it seeks here via French discovery procedures.").

Gibson, Dunn & Crutcher LLP

1    Gottlieb are not 'participants,' *per se*, in the underlying antitrust proceeding, all of the documents

2    sought by Microsoft are within the Commission's reach").

3          Here, the discovery the ROE seeks is available to the Tribunal.  First, the rules applicable to

4    the Treaty Arbitration provide for discovery.  Ex. 21 (UNCITRAL Arbitration Rules, Art. 24.3

5    (1976)) ("At any time during the arbitral proceedings the arbitral tribunal may require the parties to

6    produce documents, exhibits or other evidence within such a period of time as the tribunal shall

7    determine."); Ex. 22 (International Bar Association Rules on the Taking of Evidence in International

8    Arbitration ("IBA Rules"), Art. 3.10 (2010)) ("At any time before the arbitration is concluded, the

9    Arbitral Tribunal may (i) request any Party to produce Documents, (ii) request any Party to use its

10   best efforts to take or (iii) itself take, any step that it considers appropriate to obtain Documents from

11   any person or organisation.").  Second, because Dr. Kelsh was retained by Chevron to work on the

12   Lago Agrio litigation, his documents regarding his work for Chevron are within Chevron's control

13   and thus available to the Tribunal.  *Alper v. United States*, 190 F.R.D. 281, 283 (D. Mass. 2000)

14   ("Rule 34 'governs the discovery of documents in the possession or control of the parties themselves.

15   Given the fact that Dr. Becker is Defendant's expert, the documents which Plaintiff seeks from him

16   may be considered to be within Defendant's control.'").

17         Chevron's prior § 1782 applications seeking discovery from the LAPs' consultants and

18   attorneys, which the ROE repeatedly references in its Applications, are irrelevant to the ROE's

19   requests here.  The documents and testimony Chevron sought were related to the massive fraud being

20   perpetrated with the cooperation of the Lago Agrio court and its supposedly neutral "expert" Cabrera.

21   The Lago Agrio court already had shown that it was unable or unwilling to secure the discovery

22   Chevron sought when it unsuccessfully ordered the LAPs to obtain testimony from one of their

23   experts, Dr. Charles Calmbacher.  Ex. 23 at 9 (Order, *In re Applic. of Chevron Corp.*, No. 10-mi-

24   00076-TWT (N.D. Ga. Mar. 2, 2010)) ("Indeed, the Lago Agrio court ordered Dr. Calmbacher at

25   least twice to respond to questions concerning his sampling and reports, but was ineffective in

26   securing any responses.").  Courts granting Chevron's applications concluded that the discovery

27   sought was, regardless of the affiliation of the individuals from whom discovery was sought, not

28   within the jurisdictional reach of the Lago Agrio court. Ex. 24 at 4 (Order, *In re Applic. of Chevron*

*Corp.*, No. 10-mc-00134 (S.D. Tex. May 20, 2010)) ("Under the circumstances, it seems unlikely the Ecuadorian court would have much success in ordering Cabrera to divulge the 3TM report."); Ex. 12 at 9 (Order, *Chevron Corp. v. Champ*, No. 10-mc-00027 (W.D.N.C. Aug. 30, 2010)) ("Clearly, without the assistance of this court, the court in Ecuador would be unable to reach Mr. Champ and compel him to share his knowledge of what purportedly occurred."). Thus, Chevron's § 1782 discovery of the LAPs' experts was based on circumstances not present in the instant case. The ROE nowhere claims that the Tribunal is colluding with Chevron to prevent discovery in the Treaty Arbitration, or that the Tribunal would be unable to enforce discovery orders against Chevron's Lago Agrio experts. The ROE's repeated invocation of Chevron's prior § 1782 applications is inapposite.[11]

Because the discovery the ROE seeks can be obtained from Chevron through the Tribunal, the ROE's attempted use of § 1782 is unnecessary and improper. This Court should reject the ROE's Applications altogether, or at a minimum, stay consideration of the ROE's Applications until the Tribunal has had an opportunity set a schedule and procedure for discovery in the Treaty Arbitration.

### B.   Section 1782 Discovery Is Improper Because the ROE's Applications Conceal An Effort to Circumvent Treaty Arbitration Procedures.

Another *Intel* factor is "[w]hether the § 1782 request conceals an attempt to circumvent foreign proof-gathering restrictions." *In re Microsoft*, 428 F. Supp. 2d at 192-93. Where the applicant, as the ROE does here, attempts to circumvent the procedures of the foreign tribunal by petitioning a United States court for discovery, § 1782 discovery should be denied. *In re Applic. of Caratube Int'l Oil Co.*, 730 F. Supp. 2d 101, 107 (D.D.C. 2010) ("Here, the evidence suggests that [the applicant] is using § 1782 in an attempt to circumvent the [foreign] Tribunal's control over the arbitration's procedures, and this factor thus weighs against granting the petition.").

---

[11]   The ROE's primary argument regarding these prior § 1782 applications is that it should be entitled to "reciprocity." But the witnesses from whom discovery was sought in Chevron's prior § 1782 applications were not the ROE's witnesses. They were the LAPs' witnesses. The ROE's efforts to take discovery of Chevron's experts, while resisting any responsive discovery, are the opposite of reciprocal.

13

Gibson, Dunn & Crutcher LLP

Here, the ROE has resisted initiating any discovery or document exchange in the Treaty Arbitration, stating that it would "not incur the expense of instructing its lawyers to proceed to the merits of this case unless and until it is obliged to do so." Ex. 16 at 5 (the ROE's Letter to the Tribunal (Jan. 21, 2011)). At the same time, the ROE has asked this Court to step in and initiate Treaty Arbitration discovery in the United States. This "forum shopping" contravenes the purpose of § 1782. *See Kulzer v. Biomet Inc.*, No. 3:09-mc-275-CAN, 2009 WL 3642746, at *6 (N.D. Ind. Oct. 29, 2009) (Section 1782 is not intended "to allow unfettered access to the United States' courts or to encourage foreign parties to 'forum shop,' whenever the procedures of their home tribunal are less favorable to their case."); *see also In re Applic. of Digitechnic*, No. 2:07-cv-414-JCC, 2007 WL 1367697, at *4 (W.D. Wash. May 8, 2007) ("Digitechnic has not even tried to obtain any of the discovery sought here by way of French discovery tools. On this point, Digitechnic emphasizes that there is no 'exhaustion' requirement in § 1782. While this is correct, there is nevertheless no reason that this Court should overlook Digitechnic's failure to attempt any discovery measures in France in making the discretionary decision now before it.").

Specific guidelines have been established in the Treaty Arbitration for discovery from both parties and non-parties to the arbitration. *See, e.g.*, Ex. 22, IBA Rules, Art. 3.2, 3.3 (procedures governing document production from parties); *id.*, Art. 3.9 (procedures governing document production from non-parties). In trying to displace the Tribunal's discovery procedures, the ROE's "§ 1782 application constitutes a blatant end-run around 'foreign proof-gathering restrictions or other policies of a foreign [tribunal],'" and should be rejected. *In re Microsoft*, 428 F. Supp. 2d at 195 (rejecting § 1782 application because, among other reasons, it "attempts to divest the Commission of jurisdiction over this matter and replace a European decision with one by this Court").

### C.   Section 1782 Discovery Is Improper Because the ROE's Applications Are Overbroad and Unduly Burdensome.

An additional factor considered by the Supreme Court in evaluating applications under § 1782 is the extent to which the discovery sought is "unduly intrusive or burdensome." *Intel*, 542 U.S. at 265. Courts regularly reject § 1782 applications seeking overbroad discovery. *See, e.g.*, *Lazaridis v. Int'l Centre for Missing & Exploited Children*, 760 F. Supp. 2d 109, 115 (D.D.C. 2011) (holding that

Gibson, Dunn & Crutcher LLP

1    the nature of the discovery request rendered denial of § 1782 application appropriate, noting that the

2    "wide-ranging request suggests that [the applicant was] seeking information more for his general use

3    than for use by the [foreign] tribunals," and that "[t]he Respondents reasonably contend[ed] that [the

4    applicant's] requests would impose an undue burden on them"); *In re Marano*, No. 4:09-mc-80020-

5    DLJ, 2009 WL 482649, at *3 (N.D. Cal. Feb. 25, 2009) (denying § 1782 application because "the

6    document requests . . . are overly broad and unduly burdensome").

7    　　　　The ROE's requested discovery is impermissibly broad and intrusive.  The ROE argues in

8    support of its Applications that it seeks discovery of Dr. Kelsh and Exponent because "Chevron has

9    now submitted several of Dr. Kelsh's expert reports from the Lago Agrio action as support for its

10   Merits submission in the Treaty Arbitration."  *See* Kelsh App. at 4.  The ROE says it "seeks the same

11   types of documents and testimony that courts across the United States find are relevant in assessing

12   an expert's reports — documents that are now required to be produced in the ordinary course under

13   the Federal Rules of Civil Procedure."  Kelsh Mem. at 20.  But the actual language of its requests is

14   far broader in scope than the ROE indicates.

15   　　　　Under Federal Rule of Civil Procedure 26(b)(3)(A), a party may not ordinarily "discover

16   documents and tangible things that are prepared in anticipation of litigation or for trial by or for

17   another party," unless "they are otherwise discoverable under Rule 26(b)(1)" or "the party shows that

18   it has a substantial need for the materials . . . and cannot, without undue hardship, obtain their

19   substantial equivalent by other means."  Fed. R. Civ. P. 26(b)(3)(A) .  Rule 26(b)(4) further precludes

20   a party from discovering drafts of expert reports or disclosures or any communications between an

21   expert and the retaining party's attorney, except in certain limited circumstances.  Fed. R. Civ. P.

22   26(b)(4)(B), (C).    When read together, permissible discovery related to experts extends to

23   communications that:  "(i) relate to compensation for the expert's study or testimony; (ii) identify

24   facts or data that the party's attorney provided and that the expert considered in forming the opinions

25   to be expressed; or (iii) identify assumptions that the party's attorney provided and that the expert

26   relied on in forming the opinions to be expressed."  Fed. R. Civ. P. 26(b)(4)(C).

27

28

Gibson, Dunn &
Crutcher LLP

15

As submitted, the ROE's subpoenas cannot issue, as they seek materials that are not discoverable under the amended Rule 26.  Among numerous impermissible requests, the proposed subpoenas seek:

- All documents relating to Dr. Kelsh's actual or prospective engagement or employment by Chevron relating to the Litigation;[12]
- All documents prepared by Dr. Kelsh or by any other person for, at the direction of, or otherwise provided (directly or indirectly) to Chevron relating to the Litigation;
- All drafts of any report, affidavit, or other document submitted in the Lago Agrio litigation that Dr. Kelsh authored in whole or in part;
- All documents relating to site inspections, the taking of soil, water, or other samples, and/or the testing of soil, water, or other samples, relating to the Litigation, including any actual or proposed expert opinions or reports relating thereto, whether prepared or to be prepared by Dr. Kelsh or by any other person;
- All other documents on which Dr. Kelsh based any opinion or expert report that he prepared, signed, or for which he provided input to others, relating to the Litigation;
- All other documents relating to communications to or from (a) Chevron and/or (b) Dr. Kelsh or other experts retained or contemplated to be retained by Chevron relating to the Litigation; and
- Copies of any expert reports, deposition transcripts, trial transcripts, hearing transcripts, arbitration transcripts, or any other transcript of testimony Dr. Kelsh has offered as an expert at any time during the last ten years, regardless of the nature of the dispute.

Dkt. 1 Ex. 1, Document Requests ¶ 1-14.  These and several other requests for production in the proposed subpoenas disregard the broad protection afforded to experts' trial preparation documents under Rule 26, in direct contravention of the language of § 1782 that prohibits compelling a witness's testimony, or the production of documents, in violation of "any legally applicable privilege." 28 U.S.C. § 1782(a); *see also Intel*, 542 U.S. at 243 (Section 1782 "expressly shields from discovery matters protected by legally applicable privileges.").  The ROE has shown no need for this sweeping discovery, and has not explained how it is at all relevant to the Treaty Arbitration.  *In re Marano*, 2009 WL 482649, at *3 (denying a § 1782 application because the applicant "has not demonstrated

---

12   The ROE defines the term "LITIGATION" very broadly as "the LAGO AGRIO LITIGATION and any other litigation (including arbitrations or other dispute resolution mechanisms) involving CHEVRON'S actual or potential liability for health or environmental damage in Ecuador with or involving either the PLAINTIFFS or the REPUBLIC, whether or not other PERSONS are also involved."  Dkt. 1 Ex. 1, Definitions at ¶ 16.  With this definition, the ROE seeks discovery of Dr. Kelsh's testimony in the SDNY case, a blatant effort to circumvent discovery limits in that case and assist the LAPs in defending against RICO claims.

Gibson, Dunn &
Crutcher LLP

that the burdensome discovery request contained in Exhibit A is relevant to the British divorce proceeding, or that the request is sufficiently narrowly tailored to minimize any imposition on the proposed subpoena recipients").[13]

### D. Section 1782 Discovery Is Improper Because the ROE's Section 1782 Applications Are Being Advanced for An Improper Purpose.

The ROE's Applications also should be denied because they are being advanced for an improper purpose—to assist the LAPs' defense against Chevron's RICO claims.  *See Four Pillars Enters. Co. v. Avery Dennison Corp*., 308 F.3d 1075, 1077 (9th Cir. 2002) (upholding denial of § 1782 application in light of applicant's "proven misconduct").  The simple fact is, while the ROE asserts that it seeks this discovery urgently for the Treaty Arbitration, there are no existing deadlines in that arbitration.  The ROE's request for discovery under § 1782 thus *cannot* be prompted by any need to respond to any event in the Treaty Arbitration.  Rather, it is an improper effort to aid the LAPs by enlarging the scope and timing of discovery in the SDNY trial and interfering with Chevron's discovery and trial preparation there.[14]

The Court should reject this attempt to use § 1782 as a means to circumvent the limitations on discovery imposed by the Southern District of New York, and to "effectively to open a new front to obtain materials from" Dr. Kelsh.  *See In re Babcock Borsig AG*, 583 F. Supp. 2d 233, 242 (D. Mass. 2008) (denying motion to compel under § 1782 based in part on indications that the application was made for an improper purpose).

If the Court decides to grant discovery of Dr. Kelsh and Exponent, which it should not, Respondents request that the Court restrict the use and distribution of that discovery to the Treaty Arbitration and expressly prohibit its circulation to, or use by, the LAPs, their representatives, or any

---

[13]  If the Court decides to grant discovery of Dr. Kelsh and Exponent, which it should not, the Court should modify the ROE's subpoenas so that they seek only those documents discoverable under Rule 26 and not otherwise privileged or protected.  Should the Court decide to let the subpoenas issue as currently drafted, Respondents reserve the right to object based on Rule 26 and any other applicable protections or privileges.

[14]  As noted, Dr. Kelsh is one of Chevron's expert witnesses in the SDNY litigation; discovery in advance of the November 14, 2011 trial is set to close on September 15, 2011.

1   of their co-conspirators.  Such restrictions would help minimize improper collusion between the ROE

2   and the LAPs, protecting Respondents' rights under Rule 26.  *See United Kingdom v. United States*,

3   238 F.3d 1312, 1316 (11th Cir. 2001) (affirming discovery limits under § 1782 to prevent disclosure

4   of privileged communications or work product); *In re Labor Court of Brazil*, 466 F. Supp. 2d 1020,

5   1033 (N.D. Ill. 2006) (limiting discovery granted under § 1782 pursuant to Rule 26, and restricting

6   the use of "any materials discovered" to the specific foreign proceedings for which the discovery was

7   sought).[15]   Respondents also request that any discovery ordered not take place until after the

8   conclusion of Dr. Kelsh's testimony in the RICO action, to avoid intruding on his and Chevron's trial

9   preparations.

10   **E.   If This Court Decides to Grant the ROE Discovery Under Section 1782,**
11   **Chevron Reserves the Right to Apply for Reciprocal Discovery.**

12   An order from this Court granting the ROE unilateral discovery under § 1782 would give it an

13   improper and arbitrary advantage in the Treaty Arbitration.  Allowing the ROE to circumvent

14   Tribunal procedures by obtaining expedited discovery here, but requiring Chevron to adhere to

15   Tribunal timing, procedures and limits, would create the very sort of inequities and "time-consuming

16   battles" that Congress enacted Section 1782 to avoid.  *Intel*, 542 U.S. at 266 n.17.  Section 1782

17   grants district courts wide discretion to "maintain[] parity among adversaries in litigation."  *Intel*, 542

18   U.S. at 261-62; *see also Euromepa S.A. v. R. Esmerian, Inc.*, 51 F.3d 1095, 1102 (2d Cir. 1995).

19   Accordingly, this Court has the authority to "condition relief upon [the ROE's] reciprocal exchange

20   of information," *id.*, and may require the ROE to "mak[e] witnesses and documents available in the

21   United States," *In re Malev Hungarian Airlines*, 964 F.2d 97, 102 n.4 (2d Cir. 1992), regardless of its

22   status as a foreign litigant.  *See In re Applic. of Metallgesellschaft AG*, 121 F.3d at 80 (approving

23   reciprocal requirement for discovery request of non-resident foreign litigant).  If the Court grants the

24

25   15   If the ROE were seeking this discovery through the Tribunal rather than through this § 1782
26         proceeding, it would be bound by strict confidentiality provisions.  Ex. 22 (IBA Rules,
         Art. 3.13) ("Any Document submitted or produced by a Party or non-Party in the arbitration
27         and not otherwise in the public domain shall be kept confidential by the Arbitral Tribunal and
         the other Parties, and shall be used only in connection with the arbitration.").
28

Gibson, Dunn &
Crutcher LLP

18

ROE's broad discovery request—which it should not—Chevron reserves the right to apply for a reciprocal exchange of information between the ROE and Chevron.

## IV.     CONCLUSION

For the reasons set forth above, Respondents respectfully request that the Court deny the ROE's § 1782 Applications.   In the alternative, if the Court is inclined to allow discovery, that discovery should be limited to matters strictly relevant to the Treaty Arbitration and otherwise allowed under Rule 26 of the Federal Rules of Civil Procedure, subject to a protective order limiting its distribution and use, and Chevron's reserves the right to request a reciprocal exchange of information between the parties to avoid inequity.

Respectfully Submitted,

Dated:  August 5, 2011                              GIBSON, DUNN & CRUTCHER


By: _____ /s/*Theodore J. Boutrous, Jr.* _____
                                    Theodore J. Boutrous, Jr.

Theodore J. Boutrous, Jr.
333 S. Grand Avenue
Los Angeles, CA 90071
T: (213) 229-7804
F: (213) 229-7520

Ethan D. Dettmer
Enrique A. Monagas
555 Mission Street, Suite 3000
San Francisco, CA 94105
T: (415) 393-8292
F: (415) 374-8444

Attorneys for Chevron Corporation,
Dr. Michael A. Kelsh, and Exponent, Inc.

101124625